**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 13, 2018**

# In the Court of Appeals of Georgia

A18A0373. IN THE INTEREST OF R. D. et al., children.                    DO-013

DOYLE, Presiding Judge.

The mother of minor children R. D. (born March 12, 2015), L. D. (born January 30, 2009), K. D. (born April 10, 2007), and T. D. (born August 2, 2004), appeals from a juvenile court order finding the children dependent. She contends that the juvenile court erred (1) because the evidence did not show that any dependency was caused by the mother, and (2) by allowing the guardian ad litem ("GAL") to make objections and participate in cross-examination. Finding no reversible error, we affirm.

The record shows that the mother's involvement with the Department of Family and Children Services ("DFCS")[1] began in 2010, to address the mother's

---

[1] The parents have lived in different counties over the relevant time frame. For simplicity, we refer to each county's DFCS and juvenile court without county designation unless required for clarity.

unreasonable and excessive physical discipline of her three children born at that time. . In 2012, the three children were temporarily removed from the home due to physical abuse by the parents, and after the parents completed their case plan, the children were returned to the home less than a year later.

In 2014, while the parents were the legal guardians of three additional children (nieces of the mother), DFCS again became involved with the family after two-year-old niece J. W. received burns when the father placed her on a hot stove after ingesting Ambien while he was alone with the children. The father was later indicted for aggravated battery because of the burning and because the child allegedly tested positive for GHB, a central nervous system depressant also known as a "date rape drug."[2] J. W. also exhibited bruises on her abdomen, chest, ear, and thigh, as well as scratches on her back and lacerations on the inside of her lip; she also presented with high liver enzymes, which was not associated with any toxic substance or virus, but

---

[2] See generally *Gantt v. State*, 263 Ga. App. 102, 104 n.1 (587 SE2d 255) (2003) (explaining the drug GHB). When the father was questioned about the events of this abuse, he asserted his Fifth Amendment right against self-incrimination. In the present civil proceeding, such assertions can support a negative inference. See *In the Interest of K. N. C.*, 264 Ga. App. 475, 481 (4) (a) (590 SE2d 792) (2003), citing *Sanders v. State*, 259 Ga. App. 422, 425 (2) (577 SE2d 94) (2003) ("[A]lthough a person does have a right to invoke the privilege in a civil case in order to protect himself, when he does so, an inference against his interest may be drawn by the factfinder.").

which can result from physical trauma. The mother stated that the children injured each other, and the parents were unable to control them. Based on these facts and the parents' inability to supervise and care for the other children, the juvenile court entered a temporary disposition finding that children were dependent and temporarily placed into foster care.

In February 2015, after a hearing, the juvenile court entered an order nunc pro tunc November 2014 adjudicating the children dependent. At that time, T. D., then ten years old, had entered a residential psychiatric treatment facility based on aggressive behavior and visual and auditory hallucinations, and she had made an outcry of sexual abuse by the father that coincided with the onset of her hallucinations. The juvenile court ordered that custody remain with DFCS based on recommendations by the case manager, the parents' lack of progress on their reunification case plan, and incomplete counseling and psychological fitness evaluation of the parents.

After further proceedings with DFCS, in August 2015, the juvenile court entered an order nunc pro tunc July 2015 returning K. D., L. D., and R. D., to the custody of their parents. The order included a protective provision requiring the parents to participate in therapy with the children as well as individually, allow access

3

to the children in the home, and cooperate with DFCS. Due to continued mental health concerns, T. D. remained in custody of DFCS residing at the psychiatric treatment center.

In August 2016, the juvenile court entered a removal order as to all four children after DFCS received four reports of recent physical abuse. The next month, DFCS filed dependency petitions as to the children, and in March 2017, the juvenile court held an evidentiary adjudication hearing with both parents present. Following the hearing, the juvenile court entered an order finding the children dependent and requiring a permanency hearing within nine months. The mother filed this appeal.

1. The mother contends that there was insufficient clear and convincing evidence to support a finding that she caused any dependency. We disagree.

> [O]n appeal from an order finding a child to be a dependent child, we review the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent. In making this determination we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind

4

that "[t]he juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened."[3]

With respect to the dependency findings challenged by the mother, OCGA § 15-11-2 (22) defines a "dependent child" as one who, among other things, "[h]as been abused or neglected and is in need of the protection of the court." The Code defines the term "abuse" as "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child; [or] . . . [e]motional abuse. . . ."[4]

Here, there was evidence that the mother had a demonstrated history of involvement with DFCS, including prior adjudications of dependency stemming from her own abusive behavior and lack of supervision of the children. A child who lived in the household described his childhood atmosphere as one of daily yelling, threatening, and cursing at the children by the mother, who would routinely discipline the younger children by striking them with a hand or a belt hard enough to leave

---

[3] (Citation omitted.) *In the Interest of S. C. S.*, 336 Ga. App. 236, 244-245 (784 SE2d 83) (2016), quoting *In the Interest of A. B.*, 289 Ga. App. 655, 656 (1) (658 SE2d 205) (2008).

[4] OCGA § 15-11-2 (2) (A), (B).

visible marks. The mother also frequently hit the children's heads and slapped their lips. As the trial court's findings conclusively demonstrate, the physical discipline imposed by the mother on her children was both unreasonable and excessive. The child described the mother as "doing the most yelling."

Despite her prior involvement with DFCS, the mother's physically abusive conduct persisted. On one occasion in March 2016, after the children had been returned to the home most recently, the mother unreasonably and excessively disciplined seven-year-old L. D. by slapping or spanking her bare skin multiple times and beating her head against the wall.[5] On another occasion after the return of the children, the mother got into a physical fight with one of the children, rolling on the floor and throwing punches: "[I]t was like an actual fight with . . . [the 11-year-old child] and a grown woman." Afterward, the mother "kind of bragg[ed] about it."

Throughout the children's time in the house, on regular occasions, the mother would excessively discipline the children by forcing them to stand against a wall, facing it, with their arms held out horizontally for long periods of time, at least once

_____

[5] Also during that time, L. D. had trouble with bathroom training linked to the atmosphere in the home.

for "hours." The mother also routinely yelled and cursed at the children if they failed to daily clean the house to her standards, calling them "MF-er."

Mental health professionals who interviewed the children reported that the three older children suffered emotionally from the abusive environment maintained at the home – the youngest was too young to participate in a mental health evaluation. A clinical psychologist, Dr. Andy Anderson, who testified as an expert on parental fitness, diagnosed the mother with a trauma-related personality disorder, and explained that the mother did not acknowledge any excessive physical discipline or neglect in the household. The mother lacked insight as to the cause of her chronic involvement with DFCS. Based on his evaluation of the mother and father, Anderson stated that he did not expect the mother to change her abusive conduct, despite repeated involvement with DFCS, including mental health counseling and parenting classes: "[Y]ou'd expect history to repeat itself to some degree. . . Short of [acknowledging the problem,] you wouldn't expect somebody to miraculously begin their recovery." He also explained that the instability and multiple placements in foster care experienced by the children,

> is not good for them and contributes to social, emotional, [and] behavioral dysfunction. The reason for those – the length of time in this

7

case, I still hold the parents accountable for it because . . . on the surface, at least, the concerns expressed about their parenting are not that complicated from a social services perspective. It should have been relatively easy to resolve, at least for [the mother]. . . And so if [the mother] were making the argument that the reason that [a child's] behavior is so disordered is because she's been in foster care, in and out, I would say . . . well, the reason that she's been in [and out of] foster care . . . is because of your parenting.

This evidence, when viewed in the proper light on appeal,[6] authorized the juvenile court to find by clear and convincing evidence that the children were deprived based on physical and emotional abuse.[7] As noted above, a "dependent child" is one who "has been abused or neglected and is in need of the protection of the court."[8] The evidence showed that the children were subjected to physical abuse as well as emotional abuse that caused the children emotional harm diagnosed by the

---

[6] See *In the Interest of S. C. S.*, 336 Ga. App. at 244-245.

[7] See *In the Interest of K. B.*, 302 Ga. App. 50, 53 (1) (690 SE2d 627) (2010) (evidence that child suffered physical abuse while in her mother's custody supported juvenile court's finding that child was deprived). See also *In the Interest of S. P.*, 336 Ga. App. 488, 496 (784 SE2d 846) (2016) (physical precedent only) ("Many of the principles expressed in decisions under our former Code are helpful in determining whether dependency has been shown. . . .").

[8] OCGA § 15-11-2 (22).

examining psychologist. To the extent that the mother challenges the witness descriptions of the abuse, particularly of the incident in which she banged L. D.'s head against the wall, the credibility of the witnesses' testimony was for the juvenile court to resolve as the factfinder.[9] Although no other child was present in the room, a child was in the house nearby and testified about hearing the abuse as well as the later account told to him by L. D.[10] The juvenile court was not required to draw an exculpatory inference from the evidence,[11] especially in light of the other evidence

---

[9] See *In the Interest of T. B. R.*, 304 Ga. App. 773, 773 (697 SE2d 878) (2010) (explaining that appellate courts "do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.").

[10] This evidence was taken in an adjudication hearing. See OCGA § 15-11-181 (d) (With certain exceptions not relevant here, "the adjudication hearing shall be conducted in accordance with Title 24."). On appeal, the mother makes no challenge to this testimony on hearsay grounds, so any hearsay challenge is deemed abandoned. See *Brown v. State*, 295 Ga. 804, 814 (6) (764 SE2d 376) (2014); *In the Interest of G. Q.*, 328 Ga. App. 69, 77 (1) (c) (761 SE2d 490) (2014), citing Court of Appeals Rule 25 (c) (2). See also *Bradshaw v. State*, 296 Ga. 650, 653 n.2 (769 SE2d 892) (2015) ("Under our new Evidence Code, if 'a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible.'"), citing OCGA § 24-8-802.

[11] See, e.g., *In the Interest of J. S.*, 295 Ga. App. 861, 863 (673 SE2d 331) (2009) ("[T]his Court neither weighs the evidence nor determines the credibility of witnesses; rather, it defers to the trial court's factfinding and affirms unless the appellate standard has not been met.").

of the mother's abusive parenting in this case. Accordingly, this enumeration is without merit.

2. The mother also contends that the juvenile court erred by allowing the GAL to make objections and examine witnesses. "We review this decision de novo as it involves the interpretation of a statute, which is a question of law."[12] Based on the statutory and applicable law, this enumeration is without merit.

During the hearing, the children were represented by an attorney, and a GAL (also an attorney) was also appointed to represent their best interests, due to an apparent conflict of interest.[13] At a certain point in the hearing, the GAL attempted to make an objection on a hearsay ground. The juvenile court initially stated that the GAL would not be allowed to assert objections or participate in examination of witnesses, based on the court's understanding that the GAL was essentially acting as a lay resource to the court instead of as the children's attorney. After a lengthy colloquy, the juvenile court ultimately ruled that the GAL could make objections and

---

[12] *In the Interest of H. E. B.*, 303 Ga. App. 895, 896 (695 SE2d 332) (2010).

[13] See OCGA § 15-11-104 (b) ("An attorney for an alleged dependent child may serve as such child's guardian ad litem unless or until there is conflict of interest between the attorney's duty to such child as such child's attorney and the attorney's considered opinion of such child's best interests as guardian ad litem.").

10

examine witnesses, over the mother's objection. The mother argues that this is contrary to the statutory authority of the GAL.

As a general matter, OCGA § 15-11-104 (a) provides that, in dependency proceedings, the juvenile "court shall appoint a guardian ad litem for an alleged dependent child," and OCGA § 15-11-105 (a) requires that "[a] guardian ad litem shall advocate for a child's best interests in the proceeding for which the guardian ad litem has been appointed."

Pertinent to the mother's challenge, OCGA § 15-11-104 (e) provides that "[a] lay guardian shall not engage in activities which could reasonably be construed as the practice of law," but it says nothing about limiting the role of a non-lay guardian. In interpreting this statute, we must give effect to the use of the term "lay guardian" and avoid rendering meaningless the term "lay."[14] Therefore, we conclude that the statute creates a distinction between lay guardians and non-lay guardians, and it does not on its face limit the conduct of the latter.[15] Likewise, OCGA § 15-11-104 (e) does not

---

[14] See *In the Interest of K. S.*, __ Ga. __ (Case No. S17G1344, decided May 7, 2018), citing *Slakman v. Continental Casualty Co.*, 277 Ga. 189, 190 (587 SE2d 24) (2003) (explaining that, when interpreting a statute, a court must avoid "a construction that makes some language mere surplusage").

[15] See *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013) ("[W]e must afford the statutory text its plain and ordinary meaning, we must view

11

support the proposition that a non-lay GAL is authorized only to act as a lay witness for purposes of reporting on the best interests of a child.[16]

This is consistent with the larger statutory context.[17] OCGA § 15-11-103 (a) provides that "[a] child and any other party to a proceeding under this article shall have the right to an attorney at all stages of the proceedings under this article," and OCGA § 15-11-181 (b) (2) provides that a GAL "shall have the right to participate in the adjudication hearing." In light of this clear provision for the right to an attorney and the right of a GAL to participate in dependency proceedings, we conclude that the juvenile court did not err by allowing the non-lay GAL in this case to examine witnesses and challenge certain evidence in the service of the children's best interests. As the GAL argued to the juvenile court, "If [the mother's attorney] has the right to

the statutory text in the context in which it appears, . . . and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would.") (citations and punctuation omitted).

[16] We note that OCGA § 15-11-104 (d) provides that "[a] court shall appoint a CASA to act as guardian ad litem whenever possible, and a CASA may be appointed in addition to an attorney who is serving as a guardian ad litem." (CASA is an acronym for "court appointed special advocate," which is defined as "a community volunteer with certain training and court approval. OCGA § 15-11-2 (16).) Thus, the statutory scheme allows for the appointment of an attorney, a CASA, and an attorney acting as a GAL, as was done in this case.

[17] See *Deal*, 294 Ga. at 172-173 (1) (a).

12

object to evidence that comes in because it does not serve his client's wishes, then I should have the right to object to . . . evidence coming in because it doesn't serve the children's best interests."[18]

This outcome is also consistent with existing case law. For example, in *In the Interest of W. L. H.*,[19] the Supreme Court of Georgia addressed the standing of a child's attorney to appeal a finding of deprivation under the former Juvenile Code against the wishes of the GAL. In finding a lack of standing, the Court explained that "[t]he protector of a child's best interests is his guardian ad litem. It has previously been held that, when a court appoints a guardian ad litem to represent a minor, the minor is in effect made a party to the action and has standing through the guardian ad litem to appeal."[20] Thus, the non-lay GAL's role is more than a mere fact witness, and

---

[18] In at least one other context, a GAL has acted essentially as another party to the litigation, representing the best interests of the child. In such a case, a GAL, on its own, made motions in the lower court. See *Pate v. Sadlock*, __ Ga. App. __ (Case Nos. A18A0395, A18A0396, A18A0397; decided May 3, 2018) (GAL moved for modification of a temporary order and for "other clarification and direction regarding certain matters concerning the children").

[19] 292 Ga. 521 (739 SE2d 322) (2013).

[20] (Footnote and punctuation omitted.) Id. at 524, quoting *In the Interest of J. F.*, 310 Ga. App. 807, 808 n.1 (714 SE2d 399) (2011).

limiting the non-lay GAL's participation to that role would undermine the broad duty undertaken by a GAL in service of a child's best interests.

Finally, the mother points to no harm that arose from the GAL's participation in this case. She has identified no conflict between the GAL's role reporting her findings and her role taking part in examination of witnesses or occasional objection to evidence, nor any improper influence on the process as a conflict attorney representing the best interests of the children. "[T]he mother is required not only to show error, but harm as well."[21] Accordingly, based on the record before us, this enumeration presents no basis for reversal.

*Judgment affirmed. Dillard, C. J., and Mercier, J., concur.*

---

[21] *In the Interest of D. R.*, 298 Ga. App. 774, 779 (681 SE2d 218) (2009), citing OCGA § 9-11-61 and overruled on other grounds by *In the Interest of A. C.*, 285 Ga. 829, 833 (1), n. 3 (686 SE2d 635) (2009). See also In the *Interest of E. G. M.*, 341 Ga. App. 33, 62 (6) (789 SE2d 639) (2017).